## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOY STREETMAN SMITH,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 15-BE-2113- S** |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner of the Social** | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On September 14, 2012, the claimant, Joy Streetman Smith, applied for disability insurance benefits and supplemental security income under Title XVI of the Social Security Act. (R. 64). The claimant alleges disability commencing on August 20, 2012 because of lumbar and cervical degenerative disc diseases and chronic pain syndrome.  She also listed anxiety and depression as contributing to her inability to work.  *Id*. at 64, 66, & 168. The Commissioner denied the claim both initially and on reconsideration. *Id*. The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on April 14, 2014.  (R. 9).

In a decision dated June 6, 2014, the ALJ found that the claimant was not disabled as defined by the Social Security Act. (R. 72). On September 18, 2015, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner

1

## II. ISSUE PRESENTED

Whether the ALJ properly applied the Eleventh Circuit's pain standard.[1]

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No…presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions,…but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that

---

[1] On appeal to this court, the claimant focuses the ALJ's application of the pain standard to her complaints of back pain and does not raise issues regarding mental impairments, whether assessed separately or in combination. The ALJ addressed the claimant's medically determinable mental impairments of anxiety, depression, and overuse of controlled substances and found that they, considered singly and in combination, were non-severe and further found no evidence that they "impose any functional limitations on the claimant's ability to perform the exertional or non-exertional demands of work." (R. 67-68 &70).

would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d).

Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a

question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence,

or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206,

1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the

significance of certain facts, the court has no power to reverse that finding as long as substantial

evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only

look to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirety and take account of evidence that detracts from the evidence relied on by the

ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person is unable to " engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months...." 42

U.S.C. § 423(d) (1) (A).  To make this determination the Commissioner employs a five-step,

sequential evaluation process:

    (1) Is the person presently unemployed?
    (2) Is the person's impairment severe?
    (3) Does the person's impairment meet or equal one of the specific impairments
    set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
    (4) Is the person unable to perform his or her former occupation?
    (5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[2]

## V. FACTS

*Medical Records Regarding Physical Impairments (Back and Neck Pain)*

*Pre-2012 Medical Records*

The claimant's medical records indicated that she had a history of back and neck pain that dated back to the 1990's, including neck surgery years ago for herniated discs resulting in cervical fusion. (R. 247, 328).  A 1999 MRI report reflected that she had a L4-5 disc protrusion on the left of her spine with the remaining disc spaces satisfactory and no spinal stenosis.  (R. 326-27).  The Brookwood orthopedic practice treated her in the 1990's, giving her a series of epidural blocks that gave her relief, and then saw her sporadically in 2006 for back pain, when x-rays on her spine showed only minimal change.  Her doctors again ordered pain blocks, and she appeared to receive relief, as another lengthy treatment gap ensued. (R. 327).  The orthopedic group  resumed treating her regularly six years later in 2012. (R. 328).

 In 2009, records from Cooper Green Hospital and Dr. Adrienne Carter, a primary care/internal medicine physician, indicated that the claimant received treatment for the following conditions: 1.  Depression/anxiety; 2. Bipolar; 3. PTSD; and 4. Chronic pain in lower back and neck.  Dr. Carter's records contain an alert for prescription drug overuse/abuse and also detailed

---

[2]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases.  *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981)(Unit A).

a history of overuse of opioids.  (R. 238-39).  The mention of drug misuse/abuse dating back to

2008 occurred in other charts as well, such as Cooper Green Hospital charts.  (R. 238-39; 244,

246).  However, for the last several years, the claimant has been on a pain management plan at

the pain clinic with regular testing to check for drug misuse, and she is complying with the plan

with no current record of drug misuse. (R. 488-510 & 527-552).

*Brookwood Orthopedics Records beginning in 2012*

On February 2, 2012, treating orthopedist Dr. Dewey Jones noted that a gap of a number

of years had occurred between his last treatment of claimant and her visit that day.  He stated that

straight leg raisings produced discomfort and that the claimant had some sensory deficit on the

lateral left calf compared to the right, but that range of motion of both hips was normal.  Dr.

Jones reviewed the 1999 MRI showing a 4-5 disc protrusion on the left lumbar spine and ordered

follow-up x-rays.  Dr. Jones interpreted these x-rays of her lumbar spine as showing that the

"lateral" of the spine was within normal limits and that the L5 area, from where her pain

apparently emanated, showed no changes in the sacroiliac joint, intact pedicles of the vertebral

arch, and "a little equivocal narrowing of the L5-SI [joint] but not remarkable." Dr. Jones also

stated that an anteroposterior xray view showed no changes in the SI joints.    The doctor planned

to proceed with epidural blocks with Dr. Sovic, which had given her relief in the past, and if

blocks did not work, to consider a lumbar MRI to ensure that "we are not overlooking anything."

(R. 328).

*March 2012 MRI*

The medical records from the pain clinic described the March 2012 MRI results as

follows: "The lumbar vertebral bodies are normal in height and signal intensity.  There is normal

lumbar lordosis.  Degenerative disc disease and minimal [changes]." ( R. 497).   Dr. Marion

Sovic of Pain Management Service, P.C. sent a letter to Dr. Dewey Jones of Brookwood

Orthopedics dated March 29, 2012 that referred to the March MRI and stated as follows:

> I did discuss with [claimant] that her MRI did show some minimal
> changes with desiccation and some mild disc protrusion on the left side at
> 2/3 and also 3/4 but no other significant changes.  Currently there was no
> surgical [procedure] that she was offered and therefore, I discussed with
> her she is more than welcome to continue medicine management which
> would be Tylenol No 3 one po ti.d [3 times daily to be taken orally] for
> chronic narcotics secondary to really no etiology to substantiate the pain
> score of 10 out of 10. . . . .I do not feel comfortable giving her Lortab 7.5
> mg for an extended period of time.  If truly she is not improving with
> blocks or some medicine management she has had in the past and she has
> obtained medicines not only from our service but your service and
> multiple other physicians for narcotics.

(R. 332).

*Pain Management Clinic*

Since 1999, the Claimant has been receiving off and on epidurals and medication for pain

management of her neck and back pain. Many of these pain clinic records contain the assessment

of "chronic pain syndrome" for the claimant.  (*E.g.,* R. 483, 498, 505, 531, 541).  The records

indicate that the claimant received regular epidurals for her pain during the years of 2012 and

2014, when insurance covered the procedure, and that she received oral medication in 2013,

when she had no insurance.  The pain clinic charts reported that, in the claimant's own

assessments of pain after treatment, she reported better results with medication as opposed to

epidurals.  She reported a significant improvement of 50-90% (usually 75-80%) with medication

and reported no severe side effects of medication, such as cognitive impairment.  (*E.g.,* R. 490-

91, 495-96, 502-03, 507-08, 528-30, 533-34, 538-39).  However, her assessment of the effect of

epidurals on pain relief often indicated that the relief only lasted a few days, as reflected below.

The records from the pain clinics she visited reflected that she received epidurals/pain blocks on the following dates:

**2/10/12** (R. 351-53; no pain scores listed);

**2/24/12** (R. 243-45; no pain scores listed);

**3/20/12** (R. 335-37; no pain scores listed);

**4/19/12** (series of three pain blocks; pre-op pain score of 8; reported 100% pain relief in the left leg but increased pain in lower back with post-op pain score of 8/10 R. 442, 472);

**5/17/12 (**pre-op pain score of 10, 100% pain relief R. 454-56);

**7/19/12 -** 0% relief ( R. 458-60, 544);

**8/30/12** (pre-op pain score-8; 100% pain relief; subsequent record says 70% pain relief worked for 2-3 days R. 462-64; 478);

**9/27/12** (70% relief for 5 days; R. 530);

**10/23/12**  (Pre-op pain score 8.5, no post-op score; R. 478; subsequent record shows 75% relief for 3 days R. 544);

**2/11/14** (pre-op pain score-9; post-op-0; R. 542-49; chart notes that "Patient has had this in the past with relief that was short lived but would like to try again"; subsequent 3/6/14 chart notes say that response to the last procedure was 70% improvement for 3 weeks);

**3/6/14** (pre-op pain-7; post-op-0; R. 552).

Although a gap in the regular epidural blocks appears in 2013 and early 2014, the medical records from that period reflected that the claimant regularly visited the doctor every other month, complaining of pain, and requesting and receiving pain medication during 2013.  The records also reflected that she specifically communicated the need to hold off on block

procedures because of the lack of insurance.  (R. 493-2/7/13;498-4/4/13; R. 505-4/30/13; R. 510-6/25/13; R. 527-30 8/20/13; R. 532-36 10/15/13; R. 537-41 12/11/13; R. 542-46).  She also visited other medical clinics on 12/1/12,  5/15/13 and 10/2/13  complaining of chronic neck and low back pain. (R. 517,  522, & 537).

In these records, the claimant regularly referred to her pain as constant, although fluctuating in severity, and aching, sharp, throbbing  and/or burning.  (R. 412, 437,441, 466, 480, 484, 490, 502, 507, 528, 533, 538).  However, when having gastrointestinal problems, the claimant's medical records did not specifically report lower back pain.  (R. 512).

The pain clinic records reflected that Ms. Streetman communicated her ability to attend to her personal needs independently but stated that she does not stand for long periods of time or cook or clean.  (R. 484).  Other pain clinic records stated that she could cook, cook a little or cook sometimes (R. 412, 490, 495, 507, 528, 543).  Finally, on some pain clinic records, she stated that her pain was aggravated by activity, sitting, standing, walking, twisting, and bending (R. 480, 495), while in others she stated that her pain is aggravated simply by activity (R. 507) or a combination of the elements listed above, often but not always including sitting. (R. 466, 502, 528, 533, 538, 543).

The work history section of the pain clinic records contains certain repeated phrases eliciting a response, including the phrase "Pain interferes with work" with a "no" response. (*E.g.,* R. 428, 432, 450, 507).  In a few 2012 clinic records, the patient noted an improvement of her ability to work.  (R. 424, 428, 432, 437, 441, 449, 466).

Plain clinic reports also repeatedly reflect that the claimant has a normal gait and station. (*E.g.,* R. 505, 510, 536).

*Dr. Antonio Rozier's Examination*

In December of 2012, Dr. Antonio Rozier, a medical doctor who describes his specialty as physical medicine and rehabilitation, examined the claimant in Ogden, Utah,[3] apparently at the request of the disability determination service.  He noted that the claimant walked without assistance with a normal gait and that she sat comfortably.  She had a negative straight leg raising, seated and supine.  However, Dr. Rozier noted that the claimant had muscle spasms and trigger points in the lumbar spine and paraspinal musculature.  His examination of the lumbar spine showed 50 degrees flexion (normal 40-60) with 10 degrees extension (normal 20-35) with lateral flexion 25 degrees (normal 15-20).   His diagnosis was degenerative joint disease and degenerative disc disease of the lumbar spine. Dr. Rozier did not make any specific findings regarding the claimant's ability or inability to work.  (R. 484-87).

*Function Report*

In her Function Report for the Social Security Administration, Ms. Streetman stated that her daily activities were to "sleep most of day watch TV."  (R. 197).  Regarding meal preparation, she stated that she prepared frozen dinners, and that her "mother does most of my meals daily" and that she prepares her own meals when she can, listing meal preparation at 3-4 minutes. She claimed to do no household chores.  (R. 199).  She claimed that she can sometimes drive a car alone, but that she does not shop; her only outside activity is going to the doctor.  Her hobbies and interests were limited to watching TV and her social activities are limited to talking on the phone.  Before her back condition worsened, she used to keep her grandson and watch him

---

[3] The ALJ's opinion provided no explanation for the examination in Utah.

play football, but she can no longer do so.  (R. 200-03).

She claimed that she has chronic back and neck pain, with radiation of the pain in the left leg.  Her pain affects lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and concentration.  (R. 202).  She also stated that she wore a back brace that her doctor prescribed.  (R. 203).  Finally, she stated that she had panic attacks and lives with constant fear.

The claimant's mother also filed out a Third Party function report corroborating the claimant's own Function Report. (R. 178-85).

*Hearing Testimony*

*a.  The Claimant*

At the hearing on April 14, 2014, prior to the claimant's testimony, the Judge asked whether she was claiming medically severe impairments other than concerns with the lumbar spine.  Her attorney responded: "Your Honor, that is the meat of this case, the lumbar spondylosis, the disc protrusions and the pain as a result of that.  There are other issues in the case but we contend that those are the most severe impairments, sir."   The attorney later confirmed that lumbar spine and associated pain were the primary concerns.  (R. 11).

Ms. Smith testified that her back pain became a problem in 2009, when she had an MRI reflecting moderate facet arthropathy (pain and discomfort caused by degeneration and arthritis in the spine) and swelling at the L3 level, and disc protrusion at the L4 level. She received several epidurals for her pain, but explained that the pain blocks only helped for a day or so. She then began a pain management program. At one point, she underwent procedures in which the doctor pulled the nerves, cut them, and burned them. Those procedures "helped for a little while," but then the pain returned. To combat the pain, she has taken for years 10 mg of Lortab with Tylenol,

10

4 times a day, the maximum dosage. She rates her average pain with medication at 8-9 on a 10-point scale. (R. 15-17).   She stated that she had reduced range of motion in her neck, and the ALJ requested that the record reflect "that she does seem to have a reduced range of motion to turning her head to the left and facing me."  (R. 17).   She also claimed that she could not lift over 10 pounds.

When asked about her daily activities, Ms. Smith testified that she spends most days lying on the couch, watching TV and playing "a game" of solitaire on the computer. The transcript did not record her answer to how much time she spends on the computer, but she denied reading on the computer or participating in Facebook, or emailing.  When she cooks, she usually microwaves dinners to avoid doing the bending and standing that cooking usually requires. (R. 20-23).

Ms. Smith lives with her husband and does not leave the house regularly except to go to the doctor, and she goes to church sometimes and runs occasional errands.  She drives herself when she runs errands, if her husband is working.  Although she does not leave the house regularly, she has a relationship with her daughter, to whom she talks daily and who provides moral support regularly and drives her for her epidural blocks.  (R. 20-25).

She claimed that she had not taken medication for her depression in approximately four years, but acknowledged that she continued to take Klonopin and Trazadone daily.  She acknowledges getting anxious around crowds.  (R. 23-24).

*b. The VE*

The Vocational Expert testified as follows about Ms. Smith's past relevant work.  Her past work as a cake decorator is light, skilled, but the VE noted that her description of how she

performed the job is at a heavy level; house cleaner is a light, unskilled position; cook is a

medium, skilled position; deli worker is a medium, unskilled position; cleaner and maintenance

technician is a medium, semi-skilled job. When asked the hypothetical of what work a person of

Ms. Smith age, education, and work experience could do who is capable of no more than light

work and precluded from climbing ladders, ropes or scaffolds and from exposure to protected

heights, the VE stated that the person could perform the job of cake decorator and house cleaner.

If a restriction were added about mental functioning that would require simple instructions, the

VE testified that the house cleaner work could be performed.

Adding to the previous hypotheticals that pain precluded being able to sustain an 8-hour

work day, the VE testified that the individual could miss no more than two days per month on a

regular basis, so that level of pain would preclude full-time work. Further, the VE testified that

none of the past relevant work included skills that transferred to sedentary work.

### The ALJ's Opinion

At step one of the analysis, the ALJ determined that the claimant met the insured status

requirements through March 31, 2016, and he found that the claimant had not engaged in gainful

activity since August 20, 2012, her alleged onset date of disability. At step two, he found that she

had the following severe impairments: lumbar degenerative disc disease, cervical degenerative

disc disease, and chronic pain syndrome. He did not list any mental impairments as severe at step

two, although the claimant had listed on her disability report depression and anxiety as

contributing factors limiting her ability to work.  (R. 66, 165, 168).

At step three, the ALJ determined that the claimant does not have an impairment or

combination of impairments that meets or medically equals the severity of one of the listed

impairments. In making this determination, the ALJ mentioned the claimant's urinary tract

surgery, depression, anxiety, and overuse of controlled substances, but found that these

conditions were not severe and caused no more than minimal limitations on the claimant's ability

to perform work related activities.   (R. 67-68).

To determine the claimant's residual functional capacity, the ALJ analyzed the claimant's

subjective complaints of disabling back and neck pain by applying the pain standard. In part one

of the pain standard, the ALJ first addressed whether an underlying medically determinable

physical impairment existed that medically acceptable clinical and laboratory diagnostic

techniques could show and, if so, whether the impairment could reasonably be expected to

produce the claimant's pain. The ALJ acknowledged that the claimant had undergone nine pain

blocks and that a 1999 MRI of the cervical and lumbar spine revealed a disc protrusion at the

levels of C5-6 and C6-7 "eccentric to the left" and a protrusion at the L4-5 level "eccentric to the

left."  However, he characterized a more recent MRI in March 2012, five months before the

alleged onset of disability, as showing "normal lumbar lordosis and only mild degenerative disc

disease," consistent with the explanation of the MRI results stated in pain clinic records.  (R. 69-

70).

Addressing the first part of the pain standard, the ALJ concluded that the spine

impairment was an underlying condition that could reasonably be expected to cause the alleged

symptoms; however, in the second part of the pain analysis, he concluded that "the claimant's

statements concerning the intensity, persistence, and limiting effects of these symptoms are not

entirely credible . . . ." (R. 69).

In finding the claimant's characterization of the severity of her pain not entirely supported

13

by the evidence, the ALJ pointed to the March 2012 MRI's reflection that the lordosis was normal and degeneration mild. As further support for his credibility finding, the ALJ also noted the following: the claimant's diagnosis with chronic pain syndrome in addition to degenerative disc disease; gaps of treatment when no pain blocks were given; the claimant's normal gait and station during regular physical examinations; the claimant's reports on medical records of improvement and adequate control of symptoms with pain medication; the claimant's failure to report side effects from the medication; daily activities that did not correspond to her alleged level of pain; and Examining Physician Rozier's failure to report limitations on her ability to work. As to her daily activities, he explained that "the claimant is independent in her personal care and grooming, can drive a car, can fix simple meals, does household chores, and spends her time during the day watching television and playing games on the computer." (R. 71). As to her reports on pain improvement, the ALJ noted that she had reported "seventy to ninety percent" reduction of pain with medication and no side effects, citing Exhibits 13F and 16F. The ALJ concluded that "[n]othing in the record precludes the claimant from performing work at the light level of exertion with the additional restrictions" that she "can never climb ladders, ropes, or scaffolds, and as such, should avoid work around unprotected heights." (R. 69-70).

In determining the claimant's residual functional capacity, the ALJ considered the effects of claimant's status post urinary tract surgery, anxiety, depression, and overuse of controlled substances on her ability to work, despite his findings that those concerns were not severe.  He found that no evidence existed that these concerns imposed any functional limitations on the claimant's ability to perform the exertional or non-exertional demands of work.  (R. 68-69).

As to the weight afforded doctors' opinions, the ALJ placed "some weight" on the

14

findings of examining physician Dr. Rozier. Acknowledging that, after a "thorough examination," Dr. Rozier reached a diagnosis of degenerative joint and disc disease, finding, in the ALJ's words, that "the claimant had a slightly reduced range of motion, some muscle spasms and trigger points in the lumbar spine and paraspinal musculature" and reached a diagnosis of "degenerative joint and disc disease," the ALJ did not discredit those findings. Rather, he simply noted "that Dr Rozier did not report any limitations on the claimant's ability to perform work-related functions." (R. 71).

The ALJ gave little weight to the Third Party Function Report by the claimant's mother, as the objective medical evidence did not support the severity of the claimant's symptoms that the report alleged.  (R. 71).

Given the RFC determination and the VE's testimony, the ALJ found that the claimant is capable of performing her past relevant work as a cake decorator and as a house cleaner, and thus, that she was not disabled for purposes of the Social Security Act. (Ra. 71-72).

## VI. DISCUSSION

The claimant argues that the ALJ improperly applied the Eleventh Circuit's three-part pain standard. This court finds instead that substantial evidence supports the ALJ's pain standard determination.

The three-part pain standard applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. *Holt v. Sullivan*, 921 F.2d 1219, 1223 (11th Cir. 1991). "The pain standard requires (1) evidence of an underlying medical condition and *either* (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (3) that the objectively determined medical condition

15

is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id*. (emphasis added). A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).

In applying the three-part standard, if the ALJ decides not to credit a claimant's subjective testimony of pain, he must discredit it explicitly and articulate his reasons for doing so. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). Failure to articulate the reasons for discrediting the claimant's subjective complaints of pain requires that the testimony be accepted as true. *Id*.

In this case, the ALJ conceded that the claimant suffers from an underlying medical condition capable of generating pain: he pointed to problems in the cervical and lumbar spine revealed in the MRI which showed a disc protrusion to the left at cervical vertebrae 5-6 and 6-7 and a disc protrusion to the left between lumbar vertebrae 4-5.  However, he found that the entirety of the medical evidence failed to support the claimant's alleged severity of pain.

Rather, the ALJ pointed to two MRIs: one in 1999 showing the protrusions, and another in 2012 showing minimal changes that did not support the claimant's complaints of severe pain in the range of 8-10/10 after years of no treatment.  Although the claimant had a series of pain blocks in 1999, her pain diminished, resulting in two to three separate lengthy gaps in treatment before 2012—one from 1999 to 2006, when she received pain block(s),  another from 2006 to 2008 or 2009, and a separate gap from 2009 to 2012—indicating that her pain was manageable for years without treatment.

When she began complaining of severe back pain in 2012, her doctors ordered x-rays and an MRI to determine what had changed to cause the new severe pain.  However, her treating pain

specialist characterized the new MRI as showing "mild" and "minimal" changes.  He specifically stated that he had found nothing on the MRI to substantiate her pain score of 10 out of 10 and communicated his discomfort with regularly prescribing for her anything stronger than Tylenol No. 3.  (R. 332).  Her 2012 x-rays corroborated the MRI results reflecting only minimal changes over eleven years; as interpreted by her treating orthopedist, they showed her spine to be within "normal limits" with "a little equivocal . . . but not remarkable" narrowing at the L5-SI point where she was claiming severe pain.  (R. 328).

The third doctor to examine her, consulting physician Rozier, did not provide any information contrary to that of the claimant's treating physicians.  Although the claimant told him that her pain is worse with sitting, he noted that she sat comfortably and walked with a normal gait on the day of the examination and that all straight leg raisings were negative.  Her range of motion in the lumbar spine was normal with flexion and with lateral flexion; however, her range of motion for lumbar extension was reduced.  His findings of muscle spasms, trigger points and degenerative joint and disc disease did not contradict her treating physicians' interpretation of the 2012 MRI and x-rays nor did they call into question the ALJ's application of the pain standard.

The court recognizes that the record reflects that the claimant received pain blocks every other month in 2012 and again in 2014, with a gap in 2013 when she received regular prescriptions for medication but she did not have insurance in place to cover the block procedure.  However, her own treating physicians' characterizations of the objective medical evidence as well as the record as a whole, including the activities of daily living, provide substantial support for the ALJ's application of the pain standard.  Accordingly, the court FINDS that substantial

evidence supports the ALJ's opinion on this issue and his assessment of the intensity and persistence of the claimant's symptoms .  The claimant raises no other issue in this appeal.

## VII. CONCLUSION

For the reasons as stated, this court concludes that substantial evidence supports the decision of the Commissioner.  Accordingly, this court AFFIRMS the decision of the Commissioner.

The court will enter a separate order in accordance with this Memorandum Opinion.

DONE and ORDERED this 14th day of March, 2017.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE